Powell v. Boon & Booth.

---

POWELL, GUARDIAN, *vs.* BOON & BOOTH, ADMR'S.

[MOTION TO VACATE AND DECLARE NULL AND VOID A JUDGMENT OF AFFIRMANCE OF THE SUPREME COURT, AND TO EXPUNGE THE ENTRY THEREOF FROM THE RECORDS.]

1. *Court, jurisdiction and legal competency of; what acts are an admission of, and estop from denying.*—A party who brings his suit in a court, and prays the judgment of the court on the case made by him, or takes an appeal from the judgment of an inferior to a superior court, and assigns errors and prays the reversal of the judgment of said inferior court, thereby admits the legal competency and jurisdiction of the court, and will not afterwards be permitted to deny either, as a ground to set aside the judgment or to expunge the entry thereof from the records of the court.

2. *Provisional government instituted by Governor Parsons; acts of, legal, and obligatory upon the people of the State.*—The government inaugurated in this State by Governor Parsons, after the suppression of the late rebellion, under the commission and authority of the President of the

Powell v. Boon & Booth.

United States, although said government was declared afterwards to be an illegal government by congress, in the acts commonly known as the Reconstruction Acts ; yet, as said act does not declare said government to be void, but permitted it to be continued as a provisional government, by the military commander of the district, of which this State formed a part, and was so continued by said commander, thereby said government became a legal provisional government ; and its acts, and the acts of its officers, are legal and obligatory upon the people of said State. The fact that the judges of the courts of said provisional government, or any of them, may have been embraced in the class of persons declared by the 15th amendment to the constitution of the United States to be incompetent to hold any office, &c., may have been a good reason for their removal, yet, as long as they were permitted to hold their offices, their judgments were valid, as to the parties themselves, third persons and the public.

3. *Judgments of courts under provisional government ; what gave validity to.*—The 15th ordinance of the convention of this State, in the year 1867, declares, that all the official acts of public officers in this State, under the United States military authority, during the existence of the present provisional government, shall have the same force and validity, as if the same had been done in due course of law. This ordinance gave validity to the judgments of the court, under said provisional government.

4. *Act of November 9th, 1861 ; unconstitutionality of.*—The act of the 9th of November, 1861, entitled " An act to authorize executors, administrators, guardians, and trustees, to make loans to the Confederate States, and to purchase and receive in payment of debts due them, bonds and treasury-notes of the Confederate States, or of the State of Alabama, and coupons which are due on the bonds of the Confederate States, and of said State," is in violation of both the constitution and of the public policy of the United States, and is therefore null and void. Its purpose was to give encouragement to the rebellion then existing, and aid and comfort to the public enemies of the United States.

5. *Constitution and laws of Alabama ; not destroyed by the war.*—The constitution and laws of Alabama were not destroyed by the war, but were in abeyance, or suspense, from the want of power anywhere to enforce them.—(Per SAFFOLD, J., concurring.)

6. *Constitution of the United States ; supreme in time of war as in peace.*— The constitution of the United States is the supreme law of the Union, in war as in peace, and no citizen can be deprived of his rights, privileges and immunities granted by it, except under laws prescribed in pursuance of it.—(Per SAFFOLD, J., concurring )

7. *Acts of the rebel government in Alabama ; how should be regarded.*—The rebel government of Alabama was not a government *de facto* within the legal definition of that term, but its acts, in the ordinary administration of justice, should be regarded as valid from necessity, as well as by virtue of the confirmation of them by the legal State government.—(Per SAFFOLD, J., concurring.)

THIS was a motion by the appellants, to have the judg-

Powell v. Boon & Booth.

ment of affirmance, rendered in this cause by this court, at the June term, 1868, vacated and declared null and void, and the entry thereof, expunged from the records of the court. The grounds upon which the motion is based, appear in the opinion of the court.

S. F. RICE, for motion.—The validity of the reconstruction acts of congress, in all respects, is taken for granted, and is not treated as an open question in this case. It is the interpretation of these acts, that here claims attention.

As was substantially asserted in *Hegdon's Case*, 3 Rep. 8, by all the Barons of the Exchequer, " for the sure and true interpretation of all statutes," * * * " four things are to be discerned and considered" : 1. What was the state of the law before the enactment of the statutes ; 2. What was the mischief and defect for which the then existing law did not provide ; 3. What remedy the law-making power hath resolved and appointed to cure the disease of the commonwealth ; and 4. The true reason of the remedy. " And then the office of all the judges, is, always to make such construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief and *pro privato commodo ;* and to add force and life to the cure and remedy, according to the true intent of the makers of the statutes, *pro bono publico.*"—See *Hoffman v. The State,* 29 Ala. 43.

The reconstruction law is plainly " one of public policy." *Magham v. Cox,* 29 Ala. 89.

The first of the reconstruction acts was passed March 2d, 1867, and the last in July of that year. Prior thereto, and on the 16th June, 1866, article 14 had been proposed by the same congress, as an amendment to the constitution of the United States. At the time of the passage of the several reconstruction acts, it was not known that this article 14 ever would become part of the constitution of the United States, by receiving the ratification of three-fourths of the legislatures of the States. That proposed amendment had been rejected by the legislatures of the rebel States, in and over which the class of persons disqualified by the provisions of said proposed amendment " from

holding office," had, (or were supposed by congress to have) a controlling influence. Without the ratification of one or more of the legislatures of the rebel States, it was almost, if not quite certain, that the proposed amendment never would become part of the constitution of the United States. In the judgment of congress, the holding of office by persons of this disqualified class, was a "mischief," and the then comparative weakness in number of loyal persons, a "defect" in the rebel States. The said proposed amendment to the constitution did not provide, or offer suffrage to any of the colored race; and prior to the first reconstruction act (of March 2d, 1867,) congress had passed no act, either conferring the right to vote on colored persons in the rebel States, or disqualifying any class of persons in those States from "holding office." But the first reconstruction act not only conferred the right to vote upon all colored male citizens of lawful age, in those States, but disqualified from holding office, all persons whose disqualification for holding office was proposed or mentioned in said proposed constitutional amendment.

Congress thus clearly, by its first reconstruction act, adopted and put into immediate operation in the rebel States, the third section, (the disqualification section,) of said proposed constitutional amendment, as a controlling part and parcel of the law which was to govern reconstruction in the rebel States. And even if the proposed constitutional amendment had never received the requisite ratification of three-fourths of the legislatures of the States, and had never become part of the constitution of the United States, yet, the courts and people were bound to treat the said third section thereof as a controlling part and parcel of the first reconstruction act of congress. That third section is as much a part of that act, as if it were set forth in *extenso* upon the face of the act. Such was the plain intent of congress.

Although this act was amendable or repealable by congress, its authority, like that of a new State constitution, was paramount as to the military commanders and all the people of the rebel States. Nothing contrary to its letter or plain intent or policy, could be otherwise than null and

void.   Everything in contravention of its letter, or intent, or policy, whether done by the military commanders, or by others, was alike null and void.   The military commanders appointed under it, could no more defeat its provisions or policy, than any mere individual could do.

Looking to the circumstances under which the act was passed, and its contents, there seems no reason to doubt that its policy—the policy established by it—was to strip of all official influence, the persons disqualified by it from " holding office under any" provisional government that might exist during the operation of the act, an influence deemed by congress too pernicious and mischievous to be tolerated for a moment after the passage of the act.

The official influence of this disqualified class could not be destroyed, as congress well knew, without a destruction of their capacity to hold office.   And congress struck at the root of what it deemed a great evil, by prohibiting this class of persons, altogether, from holding office.

If Messrs. Walker, Judge and Byrd, in January, 1868, (the time of the entering of the affirmance of judgment), held office (or official authority) in Alabama, they held it under " the provisional" government then existing in Alabama; and that was precisely what the first reconstruction act substantially provided these disqualified gentlemen should not do, under any such provisional government.

The attempt to uphold the official authority of these gentlemen, upon the pretense that their official authority was recognized by the military commander, is founded on the erroneous assumption that he had a dispensing power over the reconstruction law—that he could defeat or overthrow, at his pleasure, any or all of the provisions or policy of that law.   No such dispensing power is conferred upon him, or upon the courts.—*Harrall v. The State*, 26 Ala. 56, and authorities there cited.

In the language of this court, " the law (the reconstruction law) is plainly one of public policy, which we are bound to enforce and maintain, whatever may be our opinion of its wisdom, or justice, and however severe may be its operation in particular cases."—*Mangham v. Cox*, 29 Ala. 89.

The attempt to impart to the aforesaid gentlemen official authority in January, 1868, or to uphold their official authority, by alleging the recognition of their authority by the act itself, or by the military commander, must be regarded as belonging to those "subtle inventions and evasions for continuance of the mischief," spoken of in *Heydon's case*, which that very case shows it to be our duty to suppress.

The reconstruction law does not contradict itself. Any construction of it, which makes it self-contradictory, must be rejected; and, therefore, we reject the construction which claims, that the law at the same time that it absolutely disqualifies and incapacitates a designated class of persons from holding office, either recognizes their right to hold office, or permits the military commander under it, to create such right in them, by his mere recognition or appointment.

WATTS & TROY, *contra.*—The motion is predicated upon the assumed ground, that Judges Walker, Byrd and Judge were not a court; that the State government by which they were elected, was no government; that it was organized under a provisional government—(Parsons, appointed by no competent authority,) calling, without legal authority, a convention of the people of Alabama.

To show that the President had authority to establish the provisional government, see *Satensderfer v. Webb*, 20 Howard, 176. To show that the president represented the political department of the government as to the "rebellion," see acts of congress, Feb. 28th, 1795, cited in *Luther v. Borden*, 7 How. 1; see, also, act of 13th July, 1861, in 12th vol. U. S. Statutes at Large, p. 257.

The government thus established has been recognized by the president, by the supreme court of the United States, and by congress, in numerous acts before the reconstruction act; in the reconstruction act, congress, (published with the Revised Code of Alabama—see act on page 81 of Revised Code of Alabama—) recognizes this government as a provisional government. The very preamble to the reconstruction act speaks of the government of the "rebel" States as not being "legal governments," thereby recog-

Powell v. Boon & Booth.

nizing their governments as *de-facto*. The governments therein are provisional only ; what is this but a *de-facto* ? The acts of *de-facto* governments are treated as valid everywhere. The acts of a *de-facto* judge are always regarded as valid as if rendered by a *de-jure* judge.—See *Mayo v. Stoneum*, 2 Ala. 390.

That the government of Alabama, and the judges and other officers therein, may at least be treated as a *de-facto* government and *de-facto* judges, see the reconstruction act before cited ; see, also, *Rice v. United States*, 4 Wheat.; *Prize Cases*, 2 Black. 638 ; *Mason v. Ins. Co.*, 6 Wallace, 1 ; see that part of the opinion of the court on 13th and 14th pages ; see *Mrs. Alexander's Case*, 2 Wallace, 404 ; 30 *Hogsheads Sugar*, 9 Cranch, opinion by Chief-Justice Marshall ; see the opinion of Judge Black, in the 9th vol. Opinions of Attorney-General, commencing on page 140.

In this case, the chief, Vinranco, had revolted against the government of Peru, and he and his followers, the revolutionary party, had expelled the rightful authority of the government of Peru from Iquique, one of the ports of Peru.

This chief and his followers were, after holding exclusive possession of the port Iquique, and that portion of Peru adjoining thereto, for a considerable length of time, subdued, conquered by the Peruvian government ; the chief was unsuccessful in the permanent establishment of his revolutionary government. In this respect, the case is strikingly similar to that of the Confederate States. Yet his government was held a *de-facto* one by the United States authorities, and the government was compelled to pay to citizens of the United States for the vessels seized.

The act upon which this motion is based shows that it was only intended to apply to courts having the right to try facts, and was not intended to apply to any court exercising appellate or revisory powers. Especially does the 2d section of the said act, under which this motion is made to apply to courts of original jurisdiction, and not to courts of appeal or error. The right to the new trial is given to defendants against whom decrees or judgments have been rendered

30

since the first day of January, 1865, "upon affidavit show-
ing a meritorious defense; provided that the court shall
be satisfied, from all the facts that may be submitted by
both parties, that a good and meritorious defense exists."
This section contemplates a contest, before the court hear-
ing the application, as to matters of fact. Meritorious de-
fense, *ex vi termini*, means and is confined to a defendant
in a court of original jurisdiction, and necessarily requires
the court to hear and determine questions of fact. All this
is foreign to the duties and powers of the supreme court of
Alabama. "New trial" itself means and applies to *nisi
prius* courts, and does not apply legitimately to the action
of an appellate court.

The third section and the sixth section of this act both
have clear reference to trials in courts of original jurisdic-
tion; in courts where a contestation of facts may be had.

But the act of the legislature of December 17, 1868, as
to the 2d section thereof, is unconstitutional and void. It
violates the constitution of the United States, in that it
impairs the obligation of contracts. It violates the consti-
tution of Alabama, in that it is an attempt to exercise, by
the legislature, the functions of the judicial department of
the State government. It violates the constitution of Ala-
bama, in that it undertakes to deprive private citizens of
their right of property, without due process of law.

The reasoning of Chief-Justice PECK, in the case of *Cab-
aniss v. Sanders*, decided at the present term of the court,
and the authorities cited therein, are as applicable to the
second section as to the fifth section of this act, and are
conclusive of the question involved in this motion.

This court has no power to exercise any authority, other
than that given in the constitution. That power is purely
appellate, or revisory, with perhaps a slight exception.—See
*Ex parte Simonton*, 9 Porter.

This court has no power, after the adjournment of a term,
over its records, except to correct errors, clerical or mis-
prisions.—See *Vandyke v. State*, 22 Ala.

The constitution of Alabama, so far as the supreme court
is concerned, is now what it was when Alabama first be-
came a State in the Union. Section 2, of article 6, declares,

that "except in cases otherwise directed in the constitution, the supreme court shall have appellate jurisdiction only, which shall be co-extensive with the State, under such restrictions and regulations, not repugnant to this constitution, as may from time to time be prescribed by law."

PECK, C. J.—Lewis Stoudenmire, in his life time, was the guardian of Catharine A. Hoffman, of Autauga county, the plaintiff in this motion.

After his death, the defendants, Boon & Booth, were appointed his administrators by the probate court of said county of Autauga.

On the final settlement of the accounts of said Stoudenmire, as such guardian, made by him in the probate court of said county, the court, by its decree, allowed him a credit for the sum of three thousand nine hundred dollars. This credit was allowed upon the ground that on the third of March, 1864, he had invested that sum, belonging to his said ward, in what were then known and called four per cent. certificates, of the government of the Confederate States.

The ward, by her guardian, objected to the allowance of this credit, for reasons that appear in a bill of exceptions, signed and sealed by the court, at her instance.

From this decree of said probate court, allowing said credit, the ward, the said Catharine A. Hoffman, appealed to this court, and assigned the allowance of said credit for error, and insisted the decree should be reversed for that reason.

At the June term of this court, in the year 1868, to-wit, on the ninth day of July of that year, the said appeal was heard and determined, the decree affirmed, and the judgment of affirmance was formally entered upon its records.

At the January term thereof, in 1869, the said appellant, by her counsel, entered upon the motion docket a motion to have this judgment of affirmance vacated and declared null and void, and the entry thereof expunged from the records of the court.

The grounds for this motion, as set out in the same, are the following, to-wit : " 1st. The said judgment of affirm-

ance and entry thereof, were not, and are not, the judgment or entry of the supreme court of Alabama, but of A. J Walker, Thomas J. Judge, and Wm. M. Byrd, who were, severally, at the time, incapable, under the then existing law of the land, of holding or exercising the office, or functions, or powers of the supreme court of Alabama, or of affirming any judgment; and who, at the time, had no power or authority as judges of said supreme court, or otherwise, to affirm any judgment, or to make, or cause to be made, any entry of a judgment of affirmance in or for the supreme court of Alabama.

2d. The said judgment of affirmance and entry were made without any lawful authority, and contrary to law, and are utterly void."

With the papers filed in this motion, is an agreement of the parties, signed by their respective attorneys, which it is not thought necessary to set out in this opinion. I also find with the papers, a copy of the opinion of the court affirming said decree of the probate court.

In this connection, it may be properly stated that it no where appears that the plaintiff in this motion, either in the probate court, or in this court, made any objections to the competency or jurisdiction of either court, but, on the contrary, after the decree in the probate court, the said plaintiff became the actor, and prayed the court to reverse said decree for the errors assigned by her.

I have examined that opinion carefully, and with all respect for the court, whose opinion it is, and for the learned chief-justice who delivered it, I cannot approve of either the reasoning or conclusion of said opinion. The decree should have been reversed, and not affirmed. The judgment affirming said decree is based upon the act of the ninth of November, 1861 (Pamphlet Acts, p. 53), entitled " An act to authorize executors, administrators, guardians and trustees to make loans to the Confederate States, and to purchase and receive, in payment of debts due them, bonds and treasury notes of the Confederate States, or the State of Alabama, and coupons which are due on bonds of the Confederate States, and of said State."

It is worthy of note that this act is permissive merely;

Powell v. Boon & Booth.

the language is, the parties named *may* make loans, &c., but the act nowhere, either directly or by implication even, requires such loans or investments to be made. I do this to show that all such investments were purely voluntary, and that such parties cannot plead or set up any plausible justification or excuse, on the ground that they acted under the influence of force, or the power of the *vis major*.

No one, it seems to me, who reads this act, can fail at once to see and understand the manifest purposes and object of it ; that they were to encourage and give aid to the rebellion, then existing in what are now called the rebel States, against the government of the United States. The act, therefore, was in the most flagrant sense, not only in conflict with the constitution of the United States, but also a grave violation of public policy, and, therefore, null and void.

The act being void, it can afford parties no legal justification or excuse for such investments. They should be held to be made at the peril of the parties making them, and leave them to account to their *cestuis que trusts* for the sum or sums so invested.

The decree, therefore, should have been reversed and remanded, with instructions to the probate court to charge the guardian with the amount of said investment, with the interest on the same. It is hard to conceive; and I am unable to conceive it as credible, that any prudent man, acting in a fiduciary character, could, in good faith, make such an investment at the time this investment was made. Why, Confederate bonds and treasury-notes were then worth less than five cents on the dollar, and in less than twelve months, were worth nominally less than two cents on the dollar, but, in reality, worth nothing. Such an investment strikes the mind with amazement, as an enormity, and excludes the idea of good faith. But the errors of this judgment of affirmance afford this court no reason or authority, on this motion, to declare it void, or to set it aside, or to expunge the entry of it from the records.

There is no doubt that not only this court, but also every court of record, hath the inherent power for the purpose of protecting the integrity, and preserving the purity of their

records, to strike out and expunge the entry of any order, judgment or decree made without their authority, or that in any way, or by any means, improperly finds a place upon their records.

This motion, however, does not present such a question, for the reason that the entry of this judgment was made by the order and authority of this court, as then organized.

If this court, as then organized, had the authority to entertain the appeal, and to hear and determine it, the fate of this motion is settled ; it must, in that case, be overruled.

In my judgment, it had such authority, as I will try to show before I close this opinion.

But whether it had such authority or not, there is a rule of practice, even if it had not such authority, that renders it improper for this court, now, to entertain this or any other motion, at the instance of this plaintiff, to set aside said judgment, or to expunge the entry thereof from the records, upon the ground of the incompetency of the court, or its want of jurisdiction.

As I have before stated, it no where appears that any exception or objection, even, was made in the probate court, or in this court, as to the legal competency or jurisdiction of either court. The law has settled and prescribed a certain order of pleading. In this order the first plea is to the jurisdiction of the court ; the second is to the disability of the parties ; the third, to the count or declaration ; the fourth, to the writ, and last, to the action itself, in bar thereof.

If this order be inverted, the party will be precluded from pleading any matter prior in point of time. For instance, if a party plead to the disability of the person, either plaintiff or defendant, the jurisdiction of the court is admitted. It is true, this applies to defendants and pleas, properly speaking.—1 vol. Ch. Pl. 12 Am., from 6 London edition, pp. 440, 441.

But, so far as I know, it has never been doubted, that if a party institutes a suit in a court, and prays the judgment of the court, on the case made by him, he thereby admits and acknowledges both its competency and jurisdiction. Therefore, the plaintiff in this motion, by taking her ap-

peal, and thereby becoming plaintiff in error in this court, and assigning errors and praying the judgment of this court as then constituted, has, on the record itself, made an admission that precludes her from moving to set aside the said judgment on the ground of the illegality of the court by which it was rendered, or its want of jurisdiction.

There is, however, a more satisfactory ground upon which to base this opinion overruling said motion; it is, that this court, at the time the judgment sought to be avoided was rendered, was a court legally competent to hear and determine said appeal, and to either affirm or reverse the decree of the court below, as, in its opinion, the right of the cause required.

That my views may be the better understood, a very short historical statement may not be improper. It is known that in the latter part of the year 1860, and the early part of 1861, a most flagrant rebellion broke out in that part of the United States, afterwards called the rebel States, enormous for the bitterness with which it was prosecuted, and the magnitude and power to which it attained—a rebellion, the suppression of which involved the United States in a war, such as the world has seldom seen for its greatness and the sacrifices it cost in human life and suffering, and treasure. It is also known, that conventions were assembled by the rebel portion of the people in these States, and ordinances passed to dissolve their union with the United States, and to absolve the people and all officers in said States from their allegiance to the United States and the government and constitution thereof; that new constitutions and governments were made and instituted in said States, respectively, and these new governments entered into a confederacy with each other, and made a constitution and frame of government, and assumed and took to itself the name of the "Confederate States of America."

This new government, and the governments by which it was formed, made war upon the people and government of the United States, seized by their military forces the forts, arsenals, arms, and other public property of the United States, and, so far as they were able to do

so, captured the officers and soldiers in the service of the federal government, and drove out and expelled the civil officers thereof, or compelled them to resign, and by open force and war, prevented the administration of justice under the constitution and laws of the United States, and utterly destroyed the legitimate State governments, and assumed to exercise all the powers of sovereign States, in utter hostility to the power and authority of the general government.

This rebellion, it was the duty of the United States to suppress and conquer. It was a high and imperative duty, necessary to its own preservation ; a duty it owed to the people who had intrusted and clothed it with the high powers of government. And more—a duty it owed to the great principles of human liberty and civil government.

This great duty it performed. It put forth a power and energy that astonished the world ; and after a struggle of four years, it accomplished its work. The rebellion was suppressed and subdued ; the rebel armies—the chiefest of them—were captured, and the remainder of them surrendered and laid down their arms. The governments it had called into being, both of the confederacy and of the several rebel States, were overthrown. A portion of their highest officers were arrested, and others of them fled and escaped from the country ; and the people in the rebel territories became a conquered people, and were left with no civil governments to protect them, or to save them from the evils of a wild confusion, and the terrors of anarchy.

To prevent these fearful evils and dangers, it became the duty of the power that had accomplished the great work of preserving and protecting the integrity and entirety of a common government and country, to protect and govern these people until civil State governments for them could be formed, and brought into the Union with the other States that had remained loyal to the government and constitution of the United States, and aided in the great work for their protection and preservation.

To do this was not the labor of a day. It required time. In the meanwhile, it was necessary to govern the people, and to give them, as far as possible under the circum-

stances, protection and security. This could only be done by the military power, until congress, the political power of the government, could interpose, by proper legislation, for that purpose.

The president, as commander-in-chief of the army and navy of the United States, could and should have provided for such protection and security, by virtue of his military power. But, it is my opinion, made up after much careful deliberation and reflection, that he had no constitutional warrant or authority to institute civil governments in the conquered States. Nor had the people in these States any power under the constitution, or otherwise, to create or institute such governments for themselves. They were a conquered people, and, by their treason and rebellion, had forfeited and lost all their rights and privileges under the constitution, and had, thereby, become public enemies, and could not even invoke the protection of the United States, except on the score of humanity, and such protection as they could claim, as a conquered people, by the laws of war and the law of nations.

Civil government in these States, whether temporary, or such as may, or might finally, be admitted into the Union, can only be created and formed through, and by the aid and instrumentality of legislation, and, consequently, the legislative department of the government—congress—is the only department competent to interfere and act for the accomplishment of such a purpose.

The first section, of article one, of the constitution, declares that " all legislative powers herein granted, shall be vested in a congress of the United States, which shall consist of a senate and house of representatives." By the first part of section five, it is ordained that " each house shall be the judge of the elections, returns and qualifications of its own members." And by the first part of section three, of article four, it is provided that " new States may be admitted by congress into the Union."

Although the conquered States may not, in a strict sense, be called new States, they are and were, in every just governmental sense, States out of the Union, and not in it, and I hold, to restore them to their places and privileges in the

Union, that were lost and forfeited by the rebellion, requires an exercise of the same powers necessary to admit new States into the Union ; in the strict sense of the words, that both cases stand substantially upon, and are to be governed by, the same principles. To restore the conquered States, or to admit new States into the Union, requires legislation, and as congress is the only department of the government that can exercise legislative power, congress alone could, or can do it. The president, as the head of the executive department of the government, can not lawfully exercise any legislative power under the constitution, unless thereto especially authorized. He has no constitutional power or authority to authorize the people, either in new territories or in the conquered States, to make new constitutions or forms of government, preparatory to being received into the Union.

Such authority can only be conferred by an act of congress, and when these necessary preliminary steps are taken, congress alone can admit them into the Union ; and the two houses of congress, each for itself, can alone judge of the elections, returns, and qualifications of its own members, and admit them to their seats in the councils of the nation. How, I ask, can the United States, under the said fourth article of the constitution, guarantee to the States a republican form of government, unless congress first acts and decides what government is established in a State, and also determines its character, and the lawfulness of the authority by virtue of which it was made ?

In the case of *Luther v. Borden et al.*, (7 Howard's U. S. Rep. p. 1,) Chief-Justice Taney, in delivering the opinion of the court, and speaking of this fourth article, says ; " Under this article of the constitution, it rests with congress to decide what government is the established one in a State. For, as the United States guarantee to each State a republican government, congress must necessarily decide what government is established in the State, before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican

character, is recognized by the proper constitutional authority, and its decision is binding on every other department of the government, and would not be questioned in a judicial tribunal."

The proper constitutional authority here referred to by the chief-justice, is undoubtedly congress; and, when that authority has acted, no other department of the government, or officer thereof, no judge or court of justice, can legally review its decision, or, without a plain violation of duty, question or disobey it. Again, he says in the same opinion, "In forming the constitutions of the different States, after the declaration of independence, and in the various changes and alterations which have been made, the political department has always determined whether the proposed constitution or amendment was adopted, or not, by the people of the State, and the judicial power has followed its decision."

That was an important case, was elaborately argued by the ablest counsel of the time, and received the most careful consideration of the court; and not only the paragraphs quoted, but the whole opinion, taken together, is, to my mind, a most conclusive authority to show that congress is the only department of the government authorized to reorganize and reconstruct the conquered States, and to provide for the establishment of civil governments therein; and when established, to admit them into the Union; and of necessity, therefore, congress must determine the character and validity of the governments in said States, respectively, before, or when it enters upon this work, and when it has done so, and decided the question, it is the clear duty of the courts to follow its decision.

To hold otherwise, would lead to a conflict between the different departments of the government, that would, almost certainly, end in confusion and anarchy. All such questions are eminently political in their character, and to be decided and settled by the political department of the government, and are not properly cognizable by the courts.

The president, however, took altogether a different view of this matter, and assumed, by virtue of his executive authority alone, to provide civil governments for said States.

To accomplish his purpose, he appointed provisional governors in said States. On the twenty-first day of June, 1865, Lewis E. Parsons, Esq., was appointed provisional governor of Alabama.

In his commission it was declared to be his duty, and he was therein authorized and required, at as early a period as practicable, to prescribe such rules and regulations as might be necessary and proper for convening a convention, to be composed of delegates to be chosen by that portion of the people of the State who were loyal to the United States, and no others, for the purpose of altering or amending the constitution thereof; with authority to exercise, within the limits of the State, all the powers necessary and proper to enable such loyal people of the State of Alabama to restore said State to its constitutional relations to the federal government, and to present such a republican form of State government, as would entitle the State to the guarantee of the United States therefor, and the people to protection, by the United States, against invasion, insurrection and domestic violence.

Under his appointment, Governor Parsons proceeded to convene a convention of delegates, elected under his orders; a constitution was made by said convention, known as the constitution of 1865, which was signed by Benjamin Fitzpatrick, as president, and was attested by William H. Ogbourne, secretary, on the 30th day of September, 1865. By an ordinance of said convention, an election was held in the several counties of this State, on the first Monday in November of that year, for a governor, senators, representatives, and other officers named. At this election, Robert M. Patton, Esq., was elected governor; senators and representatives, with other officers, were chosen. Governor Patton and the other officers were qualified, and the new government, thus brought into existence by mere presidential authority, went into operation; and on the 20th day of December, in the said year 1865, Provisional Governor Parsons, by order of the president, transferred the papers and property of the State, in his custody, to his excellency, Robert M. Patton, as governor of the State of Alabama.

Here, you see, was a civil government created in and for

the people of Alabama, by the President of the United States, and under his authority, without any legislation or act of congress for that purpose to warrant his course, and without, in any manner, consulting or advising with the legislative department of the government on the subject. He alone assumed the power to do this, as president and commander-in-chief of the army and navy of the United States; and claimed, too, that he had the sanction of the constitution to justify his conduct.

To all this, congress, when it assembled, utterly dissented; and denied that the president had any authority, under the constitution, for what he had done; and in due time proceeded, by several legislative acts, to adopt a system to give protection to the people of the conquered States, and to provide for them permanent civil republican governments, to the end that they might be restored and admitted into the Union, and to the enjoyment of all the rights and privileges, civil and political, that they had in the Union, and under the constitution, before the rebellion.

In the agreement of the parties referred to in this opinion, it is admitted that the said Walker, Judge and Byrd were, severally, acting and claiming to act as judges of the supreme court of Alabama, at the time of the affirmance of the said decree of the probate court of Autauga county, and the entry thereof on the records of the court.

Without this agreement, we will take judicial notice of that fact; and, further, we will also take notice that they were officers of the government, organized by the president as herein stated, elected by the legislature thereof, as judges of the supreme court of Alabama; and that they qualified and acted as the judges of said court, holding the regular terms of the same; affirming and reversing the decrees and judgments of the inferior courts of the State; and that they, and the judges of said inferior courts, were elected under the same constitution, and, together, at the time the first reconstruction act was passed, constituted the judicial department of said government.

Was that government a void government? If not, then the acts of its officers are not void, and, consequently, said judgment of affirmance is not void.

The question as to the character of that government was a grave and important question, but it is not now, an open question. In my opinion, it has been settled by the only power competent to decide it; that is, the congress of the United States.

But if it were still an open question, in my judgment, it would not be a question proper for the consideration and decision of this court.

It was, in a high sense, a political question, and has been wisely settled by the political department of the government, and I hold that the courts are bound, not only to take notice of its decision, but also to follow it.

What that decision is, will be best understood by an examination of the acts of congress on the subject.

The first of these, is the act of the 2d of March, 1867, entitled "An act to provide for the more efficient government of the rebel States."

Here, in the very title, is an admission that at that time, those were governments in said States, but that they were not efficient governments.

Under this act, it is known, the said States were divided into military districts, and made subject to the military authority of the United States; and that it was made the duty of the president to assign to the command of each district an officer of the army, not below the rank of brigadier general, and the powers and duties of these military commanders are prescribed in this act, and the two acts supplementary thereto.

The preamble to the said act of the second of March, 1867, is in the following words: " Whereas, No legal State government, or adequate protection for life and property, now exists in the rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas and Arkansas; and whereas, it is necessary that peace and good order should be enforced in said States, until loyal and republican State governments can be legally established ; therefore, be it enacted, &c." This is a clear and a distinct admission that there were governments in said States, but it goes further, and declares and determines the character of said governments ; that is,

that they were not legal governments ; but said act by no means declares them to be void governments. This preamble goes still further, and discloses and shows a plain manifestation of the objects and purposes of said act, to-wit : To provide for the establishment of loyal and republican civil governments in each of said States, and to restore them to the Union.

To accomplish these objects, congress was authorized not only to determine how it should be done, but also to select and adopt the means to be used for that purpose. To this end, congress, if it had believed the public good required it, unquestionably might have declared the government then existing in said State, not only illegal, but utterly void, and the acts of its officers nullities. This, however, it did not deem it advisable to do. In my judgment, it pursued a much wiser and better course—a course which it intended and believed would have the effect to mitigate, and, it might be, overcome and disarm much of the violence and bitterness of feeling which prevailed with many of the people who so recently had been engaged in open hostility to the government of the United States Therefore, instead of declaring that government void, the sixth section of said act provides, " that until the people of said rebel States shall be, by law, admitted to representation in the congress of the United States, any civil governments which may exist therein, shall be deemed provisional only, and in all respects, subject to the paramount authority of the United States, at any time to abolish, modify, control or supersede the same." This amounts to a declaration, on the part of congress, that the government organized by Governor Parsons, under the authority of the president, was to be considered, and held to be, a provisional government, subject, however, in all respects, to the paramount authority of congress, and might be continued and used in reorganizing and reconstructing said States, and in preparing them to be restored to the Union.

If this act, and the first supplemental act on this subject, left the meaning of congress in any doubt, the second supplemental act, I think, is too plain for misapprehension.

The first section enacts, " that it is hereby declared to

have been the true intent and meaning of the act of the second day of March, one thousand eight hundred and sixty-seven, entitled 'An act to provide for the more efficient government of the rebel States,' and the act supplementary thereto, passed the twenty-third day of March, in the year one thousand eight hundred and sixty-seven, that the government *then existing* in the rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas and Arkansas, were not legal State governments ; and that thereafter said governments, *if continued*, were to be continued subject, in all respects, to the military commanders of the respective districts, and to the paramount authority of congress."

We will take judicial notice that the military commander of the district of which Alabama formed a part, did continue the said government in this State ; that Governor Patton, and all the other officers of said government, with the exception of a few that were removed, continued to perform the duties of their respective offices, the judges of the supreme court, with the others, until the inauguration of the present State government, which has been formally received and admitted into the Union. We also know, historically, that the military commanders of the other districts did the same thing in the several States under their control ; and that they employed said governments, and the officers thereof, as they respectively thought proper, to carry into effect the objects and purposes of said acts. It is perfectly manifest that the governments here referred to, were the governments instituted as aforesaid, by and under the authority of the president ; for there were then no other governments in said States ; besides, the second section of this act declares that the commander of any district named in said act, shall have the power, subject to the disapproval of the general of the army of the United States, and to have effect till disapproved, whenever, in the opinion of such commander, the proper administration of said act shall require it, to suspend or remove from office, or from the performance of official duties, and the exercise of official powers, any officer or person holding, or exercising, or professing to hold, or exercise, any civil or military

office, or duty, in such district, under any power, election, appointment or authority, derived from, or granted by, or claimed under, any so-called State, or government thereof, or any municipal or other division thereof.

The plain and comprehensive language here employed, shows the meaning of congress, as to the character of these governments, and that it intended, if possible, to put an end to any mistakes, or misapprehensions on this subject, so important to be understood by the people, the said military commanders and the officers of said State governments. That meaning, undoubtedly is, that these governments were to be held to be provisional merely, and subject to the power and control of the military commanders respectively; and that the acts of said governments were to be considered valid and obligatory upon the people of the said States.

Congress, by these acts, considered together, conclusively settled these troublesome questions. It held them to be political questions, and proper to be decided and determined by the political department of the government only. We hold that this court is bound by that decision; and that it is its duty to take notice of and to follow it. We also hold this decision of congress to be a wise and proper decision; that there was a fitness and propriety in its being made by congress; and that the questions thus settled, are not proper for the cognizance of the courts. Congress is free to fashion its work and suit it to the necessities and exigencies of such cases, whereas, the courts, in a certain sense, are *in vinculis*, confined and straitened by precedents and fixed rules of action, from which, if they could, it is seldom either prudent or safe to depart.

There is another view of this case that has had its influence in bringing me to the conclusion, that the questions involved in it are political in their character, and not proper to be determined by the courts. It is this : the same sort of governments existed in each of the States, named in the said act of the second of March, 1867, except, perhaps, Louisiana and Arkansas, called into being under, and by virtue of the same authority. It seems to me, therefore, of

the utmost importance, that with respect to all of them, the same rule should prevail, and the same decisions be made as to the character of these governments, and as to the extent of their validity or invalidity. But if this is made to depend upon the decisions of the courts, the courts of one State might hold them to be valid, and the courts of another State might declare them void, and so there might be as many differing decisions as there are States. Such a state of things might greatly endanger the peace and prosperity of the country ; and if it would not defeat, it most certainly would impede and embarrass the reconstruction, and delay the restoration of these States to the Union.

It was insisted, and very earnestly argued by the plaintiff's counsel, that because Messrs. Walker, Judge and Byrd, were severally, in the language of said agreement, " in and of that class of persons who would be disqualified from holding office under the provisions of the third section of the amendment to the constitution of the United States, proposed by the thirty-ninth congress, and known as article fourteen, &c., and had also voluntarily aided the Confederate States in the late rebellion and war against the government of the United States, and had not, to any extent, been relieved of their disabilites by congress ; therefore, they were, respectively, ineligible to hold the office of judge of the supreme court, and for this reason, the court was not legally the supreme court of said State, but was a void court, and its judgments nullities.

This argument is altogether more plausible than sound Their ineligibility may have been a good reason for their removal, but, so long as they were permitted to hold their offices, and to discharge the duties of a supreme court, their judgments were valid, as it regards the parties to such judgments themselves, third persons and the public.

I readily admit, the court by which the said judgment of affirmance was rendered, was not the supreme court of the State of Alabama, in the same sense in which the supreme court before the rebellion and since the restoration of the State to the Union, was, and is, the supreme court of said State. The supreme court then, and now, derived and de-

rives its authority from the constitution of the State; but the supreme court at the time said judgment was rendered, held its authority under, and by virtue of, the said acts of congress, and by the permission of the military commander of this district, and was the supreme court of said provisional government, and as such, had the powers of a supreme court, and authorized to entertain said appeal, and to hear and determine the same.

One reason more, why this motion should be denied, and this opinion ends. The people of the State took this matter into their own hands, and settled the question for themselves. By ordinance No. 15 of the convention of 1867, it is declared, "That all the official acts of public officers in this State, under United States military authority, during the existence of the present provisional government, shall have the same force and validity as if the same had been done in due course of law." This language is broad and comprehensive enough to embrace, and does embrace, the judgments of courts, and the acts of judicial officers, as well as the acts of other public officers, whether civil or military, for they were all alike under the control of the military commander, subject, however, at all times, to the paramount authority of congress.

My associates concur with me in this opinion; the motion, therefore, is overruled at the costs of the plaintiff in the motion.

B. F. SAFFOLD, J.—I concur in the judgment of the court, overruling the motion to annul the judgment of this court, rendered at a former term in this case, on account of the insufficiency of the reasons assigned in support of the motion.

The reasoning of a justice of the supreme court, to sustain the conclusion of the court in any matter presented for its judgment, is not an adjudication of other questions than those necessarily involved in the decision of the cause. But the argument is often used in other causes in aid of the propositions it tends to establish, and is a clear indication of the opinion of its author respecting such questions.

The matters treated of in the opinion delivered by the

chief-justice in this case are of great importance, and my views in reference to some of them are essentially different from his. This is my apology for recording a dissent on issues not material to the conclusion.

I propose to speak in a general way of the subjects herein discussed. The light of many years must fall on our recent history before it can be read with accuracy in detail.

In the case of *Hall v. Hall*, at the present term, Judge PETERS has expressed his opinion that the acts of the legislature and of the courts existing in the State during the rebellion, are absolutely void, except so far as they have been separately and formally re-enacted and adopted since the restoration of the State to the Union. I deem it my duty to dissent in some measure from this declaration.

The ordinance of secession was adopted on the 11th January, 1861, by a State convention elected by the people, under the forms of law. Up to that time, the State, in all the senses in which that word may be politically applied to the territory and the people of Alabama, was in accord with the federal government, a member of the United States, subject to the rightful jurisdiction thereof, and entitled to all the rights and privileges guaranteed by the constitution of the United States, and protected by the constitution of the State. The act of secession was void, and all the legislation in pursuance thereof, and hostile to the United States, was also void, because in violation of the federal constitution.

What became of the constitution and laws of the loyal State of Alabama, when the insurrectionary government was put in operation? Had they no existence? · Were there no persons in the territory of the State who had no interest in, and a right to, them? They could not be legally destroyed by that which was legally void. They were simply in abeyance, or suspense, for the want of power anywhere to enforce them. It was the duty of the federal government to enforce them whenever, and as far as it was practicable to do so, in behalf of any citizen of the State loyal to the Union.

It is said that the supreme court of the United States has decided that, by the law of nations, each individual,

residing within the insurrectionary districts of this sec-
tional or territorial war, became, by virtue of his residence,
an enemy to the Union, divested of every right and privi-
lege, and entitled only to the humanity of the lawful power.

I can not believe that such a decision has been made by
that high tribunal. If the insurrection, instead of being
circumscribed by well-defined geographical boundaries, had
been diffused over the entire country, the principle would
be impossible of application. But what is this law of na-
tions, before which, in war, our great charter must subside?
Is it anything more than the acts of nations, oscillating
between mercy and cruelty, as reason or passion prevails?

It is easy to see how the government of the United States,
seeking to enforce its jurisdiction over the territory and the
people of the insurgents States, against fierce opposition,
could not stop in the midst of battle to try the rights of
individuals. There is sanction in the constitution for taking
the property of the citizen for the public use, and reason
in postponing the just compensation until peace should be
restored. If an insurrectionary district is invaded by the
armies of the rightful power, and the loyal inhabitants are
injured by them, it is because the paramount right and
duty of suppressing the insurrection impels it to be so. If
their property on the seas is captured, because owned in
the disaffected district, and condemned as lawful prize to
the captor, it is because, in the midst of war, justice is si-
lent from necessity—not because the individual has for-
feited his right to protection. This is what the supreme
court of the United States, in the *Prize Cases*, and in the
case of *Mrs. Alexander's Cotton*, has decided; and nothing
more than this. The constitutional rights and status of
the loyal citizen are not lost by residence in the disturbed
district, but, like the constitution and laws of his State, are
in suspense, from the inability of his government to assert
and defend them.

That the State of Alabama remained a State of the
Union, and her citizens continued to be citizens of the Union,
entitled to all the rights and privileges of such, except so
far as each individual forfeited his own by his conduct, and

subject to all the duties of such, is proved by the action of the federal government itself.

The proclamation of the president, in April, 1861, declaring the existence of an insurrection in certain States, recognizes the presence in them of loyal citizens. The confiscation act of congress, of August 6th, 1861, is aimed only at property used in aid of rebellion. The act of July 17th, 1862, to punish treason, excepts from its operation persons which held their offices before the attempted secession, and who had not taken an oath of allegiance to the Confederate States. The emancipation of slaves proclaimed by the president, September 22d, 1862, was to have no application within those States in insurrection which should be represented in congress on the 1st of January, 1863. The act of congress of March 12th, 1863, regulating the disposition of captured and abandoned property, provided for the return of its value to loyal owners. These acts, and the recognition of a loyal government in Virginia, and the sanction given to the State governments formed in Louisiana and Arkansas during the war, establish the existence in the rebel States of a population entitled to reorganize their State governments, and to possess and enjoy all the rights and privileges guaranteed by the federal constitution to an American citizen. In addition to this, the emancipation of the slaves, by arms and legislation, was not deemed beyond a revival of the rights of the owners, or a claim to compensation, until the 13th and 14th amendments to the constitution were secured.

If residence within an insurrectionary district stamps on each individual therein, the character of enemy to his government, entitled only to its humanity, then residence, more powerful than the constitution, dissolves allegiance, changes patriotism into crime, and makes treason a duty.

The United States, by the various acts mentioned above, acknowledged its obligations to the loyal inhabitants of the southern States, surrounded as they were with perils, as far as it was possible to do. Her judicial history should be a memorial to posterity of justice done, and right acknowledged, that in like dangers in the future, those who love the Union of the States and are willing to suffer for a

grateful nation, may not seek security under the ruling power of their section, whether it be a frantic mob, a civil rebellion, or the cold tyranny of the lawful power.

On the termination of the war, the president put in operation a provisional government, and re-established the constitution and laws of the State, existing anterior to the adoption of the ordinance of secession. By his authority, a State convention was assembled in September, 1865, which organized a State government. Under this State government two legislatures were convened. Both the convention and the legislatures passed laws which were adjudged by the courts and enforced by the executive department. The acts of the rebel State government were recognized so far as they were not in conflict with the federal and State constitutions. In March and July, 1867, congress, by the reconstruction laws, instituted a military government in the State, with permission to use the local civil tribunals, which were declared to be provisional only, previous to the admission of representatives into congress· These provisional governments enforced the laws made by themselves, and recognized and enforced the laws and judgments of the rebel State government, allowing, for good cause shown, a review of the acts of its courts. In November 1867, the State convention, authorized by congress to frame a constitution and civil government for the State, confirmed the acts of the rebel government by clear implication in providing for a review of its judicial action by the legal State courts.

It is insisted that the rebel courts had no jurisdiction of the causes they determined, and that it is beyond the power of State legislation to validate their judgments ; that the action of a court without jurisdiction is void, and the statute alone would constitute the adjudication upon the rights of the parties. This is an objection which ought to be conclusive against such legislation, except under those extraordinary circumstances which occur but seldom in the history of a people, and which may be admitted as exceptional cases. The federal constitution does not forbid a State legislature to exercise judicial functions. The ordinances of a State convention are of as high authority as the State

constitution. During the war the courts remained as they were constituted under the legal government. Most of the judges were legally elected. The jurors were such as were qualified to serve by the valid law. The people retained their right to the administration of justice without denial or delay. They resorted to these courts for a decision of the issues between them. When the war was over, what hindered them, in their sovereign capacity, from enacting a bill of peace to quiet the litigation of years? What was more just than to stamp the adjudications of the rebel courts with the character of provisional judgments, to be annulled, and a new trial granted for good cause shown.

The principle of the validity of *de-facto* governments, is undoubtedly applicable to the provisional governments since the war, and, perhaps, on all ordinary subjects, to that existing during its continuance. It depends, solely, on the simple and sufficient reason, that when an illegal government has existed for a considerable time, it is better to acquiesce in what has been done, than to still further convulse and demoralize society, by vainly seeking to run a thread of legality through the mode of its doing.